IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

LOUISE PETERS                                                          PLAINTIFF

v.                            Civil No. 04-2250

JO ANNE B. BARNHART, Commissioner,
Social Security Administration                                   DEFENDANT

## MEMORANDUM OPINION

Plaintiff Louise Peters brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration denying her application for disability insurance benefits (DIB) under the provisions of Title II of the Social Security Act.

**Procedural Background:**

On June 11, 2003, Peters protectively filed an application for DIB benefits. (Tr. 11, 48-50). Peters alleged a disability onset date of February 25, 1972, due to fibromyalgia, major depression which had become chronic depression, anxiety/panic disorder, chronic fatigue syndrome, muscle spasms, acid reflux, irritable bowel syndrome, and arthritis. (Tr. 64).

An administrative hearing was held on June 15, 2004 (Tr. 276-298). Peters appeared and testified. (Tr. 281-296). Montie Lumpkin, a vocational expert, was also called to testify. (Tr. 296-297). Peters was represented by counsel. (Tr. 278).

By written decision dated July 27, 2004, the administrative law judge (ALJ) found Peters not disabled within the meaning of the Social Security Act. (Tr. 8-16). He concluded she did not have a severe impairment. (Tr. 14).

AO72A
(Rev. 8/82)

Plaintiff appealed the decision of the ALJ to the Appeals Council. (Tr. 29). The decision of the ALJ became the final decision of the Commissioner when the Appeals Council denied Peters' request for review. (Tr. 3-5).

**Evidence Presented:**

At the hearing before the ALJ, Peters testified she was fifty-six years old. (Tr. 281). She has a high school diploma. (Tr. 282). Peters indicated she lived alone but had been married for thirty-six years until her divorce in 2000. (Tr. 282).

Peters' last full-time employment was as a telephone operator. (Tr. 286-287). She worked there for six years, until February of 1972 when she had a breakdown and was hospitalized for a little over three weeks. (Tr. 283, 287). Her hospitalization was due primarily to psychiatric problems but she was also having problems with her back and was given physical therapy while hospitalized. (Tr. 287-288).

Following her hospitalization she was on sick leave until February of 1973 when she submitted her resignation. (Tr. 283). According to Peters, Dr. Henry Sims told her to quit her job. (Tr. 283).

She didn't work again until 1979 when she took a part-time job at a friend's convenience store. (Tr. 284). She worked the cash register two or three hours a day. (Tr. 284). However, she only worked about fifteen hours a week. (Tr. 284). She worked part-time for four or five months. (Tr. 294). She stopped working there because of muscle spasms in her back. (Tr. 294).

Since 1972, Peters testified she has seen various psychiatrists and orthopedic doctors for different problems. (Tr. 288). She indicated she had a number of muscle problems and Dr. Long

AO72A
(Rev. 8/82)

had finally told her she had spastic torticollis[1] which she had to live with. (Tr. 289). However, Peters testified the doctors really didn't know what was causing her problems. (Tr. 289).

Peters testified that her depression had continued throughout the years. (Tr. 291). After she got out of the hospital in 1972, Peters testified she did what she could but she had difficulty taking care of her daughter and keeping up the housework. (Tr. 294).

Over the years, she was treated by various orthopedic doctors. (Tr. 295). Peters testified she had physical therapy and was put on muscle relaxers when she had a bad spell. (Tr. 295). She was later diagnosed by Dr. Florian with fibromyalgia. (Tr. 289).

Montie Lumpkin testified Peters' work as a cashier/checker would be described as light and semi-skilled. (Tr. 297). He indicated Peters' work as a telephone operator would be considered sedentary and semiskilled. (Tr. 297).

The record contains the following medical and vocational evidence. On February 12, 1970, Peters was seen at the emergency room of Sparks Memorial Hospital. (Tr. 178). She was complaining of pain in her neck and left shoulder. (Tr. 178). An x-ray of the cervical spine was normal. (Tr. 179).

On January 29, 1973, Dr. H.M. Sims wrote in a letter that Peters had been hospitalized on February 25, 1972, with a diagnosis of neurodermatitis, facial. (Tr. 94). Peters underwent psychotherapy during which "she was able to verbalize a great deal of her resentment and dissatisfaction with her parents and her husband's apparent loyalty toward her father and what she thought was actual disinterest in her strong feelings toward her parents." (Tr. 94). Dr. Sims noted her condition on discharge on March 19, 1972, was improved. (Tr. 94).

---

[1] Torticollis is prolonged contraction of the neck muscles that causes the head to turn to one side. Medline Plus, Medical Encyclopedia, http://www.nlm.nih.gov/medlineplus/ency/article/000749.htm

AO72A
(Rev. 8/82)

During the hospitalization, Dr. Sims stated Peters also complained of pain and discomfort in her lower lumbar area as well as tightness in the hamstring muscles. (Tr. 94). Spinal x-rays showed no particular abnormality. (Tr. 94). She received physical therapy treatments. (Tr. 94).

On March 28, 1972, Dr. Hathcock noted Peters' left parvertebral muscle spasm and pain was almost gone. (Tr. 197). He indicated she merely had some tenderness above the pelvis on the left. (Tr. 197). On her next visit to Dr. Hathcock, Peters complained that her back hurt her occasionally but it was mostly her leg bothering her. (Tr. 197).

Later office notes from Dr. Hathcock in 1972 indicate Peters' physical examination was unremarkable. (Tr. 196). He indicated a myelogram was a possibility as were physiotherapy, and injections into the muscle mass of her back. (Tr. 196). In June of 1972, Dr. Hathcock did inject the parvertebral muscles on the left at about the lower margin of the rib cage. (Tr. 196). Peters had tenderness and spasm. (Tr. 196). Otherwise neurologically she checked out well and looked good clinically. (Tr. 196).

Peters reported that the injections had not been helpful. (Tr. 196). Dr. Hathcock concluded the neurology department should see her. (Tr. 196).

On December 15, 1973, when Peters was dancing, she caught her foot hyperflexing the great toe at the IP (interphalangeal) joint. (Tr. 195). She was diagnosed as having a ligamentous disruption about the IP joint of the left great toe. (Tr. 195).

Upon physical examination of Peters' back, Dr. Long noted she had a full range of motion of the back and no CVA (costovertebral) tenderness. (Tr. 193). Straight leg raising and deep tendon reflexes were normal. (Tr. 193). He did note her right shoulder was lower then her left. (Tr. 193).

AO72A
(Rev. 8/82)

On April 5, 1974, Dr. Long noted Peters complained of mild numbness down the left leg on the lateral side. (Tr. 190). He indicated she was not able to curl her toes on her left side. (Tr. 190). Dr. Long noted that the long flexor muscles of Peters' left lower extremity area were not functional. (Tr. 189). Upon physical examination, she had a negative straight leg raising and negative sciatic tension test. (Tr. 190). He noted no clinical atrophy or difference in circumference between the two calves. (Tr. 190). Dr. Long stated he did not know why Peters was unable to flex her toes but stated he believed this was apparently a true finding. (Tr. 190).

On January 26, 1975, Peters was seen by Dr. A.B. Hathcock complaining of right shoulder pain. (Tr. 188). She was seen the following week by Dr. Long and it was noted her right shoulder pain had improved. (Tr. 188).

Note was made of the fact that she had an inability to flex her toes on the left side in association with her back pain. (Tr. 188). Dr. Long believed this was probably a hysterical component to her back symptoms. (Tr. 188).

An x-ray of Peters' dorsal spine on August 11, 1978, was normal. (Tr. 186). Peters was examined at Holt-Krock Clinic that same day and her examination revealed a full range of motion of her neck and back and no limitation of motion in her upper extremity joints. (Tr. 187). Her neurologic examination was normal and she had no areas of tenderness. (Tr. 187). The diagnostic impression was listed as interscapular muscle spasm with extension into the neck. (Tr. 187). There was no clinical evidence of nerve root irritation or mechanical derangement. (Tr. 187).

On October 16, 1979, x-rays of Peters cervical and thoracic spine were normal. (Tr. 182) On that same date, Dr. James W. Long noted he had seen Peters periodically for spastic torticollis. (Tr. 183). Upon examination, he noted she had a full range of motion of the neck and

-5-

no limitation of ability to elevate the shoulders, hold them against resistance or shrug them. (Tr. 183). He noted some tenderness over the dorsal spinous processes of C-7 and T-1. (Tr. 183). The neurologic examination was normal. (Tr. 183).

In late 1986, Peters was experiencing some panic symptoms and shortness of breath in apparent response to taking a medication, Ditropan, prescribed for a urinary tract infection. (Tr. 95, 97). She was hospitalized from August 26, 1986, until August 30, 1986, as a result of "ongoing malaise, cough, dyspnea, and paresthesias of the right arm and leg." (Tr. 120, 121, 122-138).

Other than the one incident when she was hospitalized for a rash on her face in 1972, Peters gave a "negative history for any psychiatric difficulties preceding this time." (Tr. 126, 95). She also reported having been in good general health throughout her life. (Tr. 149).

In November of 1986, Peters was diagnosed with agoraphobia and panic attacks. (Tr. 95). Comment was made that it could well represent a depression. (Tr. 95). On April 1, 1987, Dr. A. Pat Chambers recommended that Peters be hospitalized for the purpose of either antidepressant treatment or electroconvulsive therapy. (Tr. 103-104).

In office notes dated September 23, 1992, Dr. Thomas F. Florian indicated he believed Peters had either fibromyalgia or chronic fatigue syndrome or some overlap of these disorders. (Tr. 106-108). Peters reported having a history of chronic pain in the leg, neck, shoulder, and back since 1970. (Tr. 106). She indicated the pain began after she was in an automobile accident. (Tr. 106). Peters continued to be followed by Dr. Florian until October 28, 1993, and he tried a variety of medications and an exercise program to alleviate her symptoms. (Tr. 106-118).

AO72A
(Rev. 8/82)

On March 9, 2000, Dr. Max Baker wrote that Peters had been diagnosed as having atypical depression due to the high level of accompanying anxiety. (Tr. 162). He stated her symptoms had been chronic and disabling and her prognosis was poor. (Tr. 162).

**Applicable Law:**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3),

AO72A
(Rev. 8/82)

1382(3)(c). A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. *See* 20 C.F.R. §§ 404.1520, 416.920. Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §§ 404.1520, 416.920.

**Discussion**:

In order to have insured status under the Act, an individual is required to have twenty quarters of coverage in each forty-quarter period ending with the first quarter of disability. 42 U.S.C. § 416(i)(3)(B). Plaintiff last met this requirement on June 30, 1976. (Tr. 12). Accordingly, the overreaching issue in this case is the question of whether plaintiff was disabled during the relevant time period of February 25, 1972, her alleged onset date of disability, through June 30, 1976, the last date she was in insured status under Title II of the Act.

In order for plaintiff to qualify for disability benefits she must prove that, on or before the expiration of her insured status she was unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which is expected to last for at least

twelve months or result in death. *Basinger v. Heckler*, 725 F.2d 1166, 1168 (8th Cir. 1984). The medical evidence of plaintiff's condition subsequent to the expiration of plaintiff's insured status is relevant only to the extent it helps establish plaintiff's condition before the expiration. *Id.* at 1169.

In this case, the ALJ concluded Peters did not have a severe impairment prior to the date she was last insured, June 30, 1976. (Tr. 14). The ALJ first found that there was no medical evidence of record that Peters' mental condition imposed more than a minimal effect on her ability to perform work related activities on a sustained basis prior to June 30, 1976. (Tr. 14). We agree. While Peters was hospitalized with a diagnosis of facial neurodermatitis from February 25, 1972, until March 19, 1972, Dr. Sims indicated in correspondence dated January 29, 1973, that she was able to verbalize feelings of resentment and dissatisfaction during psychotherapy and was discharged in an improved condition. (Tr. 94).

Although she continued to be seen for various reasons by Dr. Sims and other doctors, there is no indication in the record that Peters received further psychiatric treatment, was regularly taking psychiatric medications, or that her daily activities were restricted from psychological causes prior to the expiration of her insured status. *Jones v. Callahan*, 122 F.3d 1148, 1153 (8th Cir. 1997). In fact, it appears she did not receive further treatment for any type of mental impairment or psychiatric problem until 1986 when she experienced an apparent adverse reaction to a prescription medication, Ditropan. (Tr. 95, 97). At that time, Peters gave a negative history for any psychiatric difficulties other than the one hospitalization in 1972. (Tr. 126, 95).

With respect to Peters' physical complaints, she was treated in the emergency room on February 12, 1970, for complaints of neck and left shoulder. (Tr. 178). Then during her

-9-

hospitalization in February/March of 1972, she complained of pain and discomfort in her lumbar area. (Tr. 94).

She was examined by Dr. Henry Sims on February 26, 1972 (Tr. 180). Upon physical examination, he noted she had symmetrical reflexes and straight leg raising was positive only to about 70 degrees. (Tr. 180). Spinal x-rays showed no abnormalities. (Tr. 94). Other than a tender left rector spinae muscle extending from the rib cage to the pelvis, Dr. Sims could find no other tender areas or trigger points. (Tr. 180). He suggested a myelogram to rule out the possibility of nerve root irritation; however, Peters did not believe one was necessary at that point. (Tr. 180). Peters underwent physiotherapy in the form of heat and massage, analgesics, and muscle relaxers. (Tr. 180).

Peters was followed by Dr. Hathcock who noted on March 28, 1972, that Peters' muscle spasm and pain was almost gone. (Tr. 197). On her next visit, Peters indicated her back hurt only occasionally but her leg had been bothering her. (Tr. 197).

Dr. Hathcock reported that Peters' physical examination was unremarkable. (Tr. 196). In June of 1972, he did inject the parvertebral muscle mass of her back. (Tr. 196).

In December of 1973, following an injury to her left great toe, Peters was examined by Dr. Long, he noted that Peters had a full range of motion of the back and no CVA tenderness. (Tr. 193). Straight leg raising and deep tendon reflexes were normal. (Tr. 193). In April of 1974, Peters had a negative straight leg raising and negative sciatic tension test. (Tr. 190).

Note was made of the fact that Peters was unable to flex the toes on her left foot. (Tr. 190). This was mentioned again in early 1975. (Tr. 188). However, Peters was able to toe and heel walk, her deep tendon reflexes were normal, and her x-ray was normal. (Tr. 192).

AO72A
(Rev. 8/82)

Between February of 1975 and the expiration of her insured status on June 30, 1976, there is no indication Peters sought treatment for this condition or for problems with her back. In August of 1978, Peters' physical examination revealed a full range of motion of her neck and back and no limitation of motion in her upper extremity joints. (Tr. 187). With respect to fibromyalgia, fatigue, and acid reflux, the ALJ correctly noted there was not record evidence that these conditions were present prior to Peters' last date insured, June 30, 1976. (Tr. 15).

There are no medical records indicating any physician placed, or noted, any physical limitations on Peters' ability to do work related activities. There is nothing to suggest that during the relevant time period Peters had a physical impairment that would have had more than a minimal effect on her ability to do work. The ALJ therefore properly terminated the analysis after determining Peters had no severe impairment. *Nguyen v. Chater*, 75 F.3d 429, 431 (8th Cir. 1996).

**Conclusion**:

For the reasons stated, the court finds that the decision of the Commissioner denying benefits to the plaintiff should be affirmed. A separate judgment in accordance with this opinion will be entered.

Dated this 16th day of November 2005.

/s/ Beverly Stites Jones
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)